Slip. Op. 19-154

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AUTOLIV ASP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>ARCELORMITTAL TUBULAR PRODUCTS, MICHIGAN SEAMLESS TUBE, LLC, PTC ALLIANCE CORP., WEBCO INDUSTRIES, INC., ZEKELMAN INDUSTRIES, INC., and PLYMOUTH TUBE CO., USA,<br><br>Defendant-Intervenors. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 18-00037 |

**OPINION**

[Sustaining final affirmative material injury determinations.]

Decided:  December 6, 2019

Kenneth G. Weigel and Chunlian Yang, Alston & Bird LLP, of Washington, DC, for Plaintiff Autoliv Asp, Inc.

Brian R. Soiset, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, for Defendant United States International Trade Commission. With him on the brief were Dominic L. Bianchi, General Counsel, and Andrea C. Casson, Assistant General Counsel for Litigation.

R. Alan Luberda, Kathleen W. Cannon, and Melissa M. Brewer, Kelley Drye and Warren LLP, of Washington, DC, for Defendant-Intervenors Arcelormittal Tubular Products, Michigan Seamless Tube, LLC, PTC Alliance Corp., Webco Industries, Inc., Zekelman Industries, Inc., and Plymouth Tube Co., USA.

Gordon, Judge:    This consolidated action involves the final affirmative material injury determinations by the U.S. International Trade Commission ("ITC" or "Commission") in the countervailing duty ("CVD") and antidumping duty ("AD") investigations into imported cold-drawn mechanical tubing ("CDMT") from various countries. See Cold-Drawn Mechanical Tubing from China and India, 83 Fed. Reg. 4,269 (Int'l Trade Comm'n Jan. 30, 2018), and Cold-Drawn Mechanical Tubing from China, Germany, India, Italy, Korea, and Switzerland, 83 Fed. Reg. 26,088 (Int'l Trade Comm'n June 5, 2018), respectively ("Final Determinations"); see also Cold-Drawn Mechanical Tubing from China and India, Inv. Nos. 701-TA-576-577 (CVD Final), USITC Pub. 4755 (Jan. 2018), PD[1] 218 ("Views"), and Cold-Drawn Mechanical Tubing from China, Germany, India, Italy, Korea, and Switzerland, Inv. Nos. 731-TA-1362-1367 (AD Final), USITC Pub. 4790 (May 2018), PD 271.

Before the court is the USCIT Rule 56.2 motion for judgment on the agency record filed by Plaintiff Autoliv ASP, Inc. ("Autoliv"). See Pl.'s Mot. for J. on the Agency R., ECF No. 28 ("Pl.'s Mot."); see also Def.'s Resp. to Pl.'s Mot. for J. on the Agency R., ECF No. 29 ("Def.'s Resp."); Def.-Intervenors Arcelormittal Tubular Products, Michigan Seamless Tube, LLC, PTC Alliance Corp., Webco Industries, Inc., Zekelman Industries, Inc., and Plymouth Tube Co., USA's Resp. Opp. Pl.'s Mot. for J. on the Agency R., ECF No. 30 ("Def.-Intervenors Resp."); Pl.'s Reply in Supp. of Mot. for J. on the Agency R., ECF No. 31 ("Pl.'s Reply"). The court has jurisdiction pursuant

---

[1] "PD" refers to a document in the public administrative record, which is found in ECF No. 22, unless otherwise noted. "CD" refers to a document in the confidential administrative record, which is found in ECF No. 21, unless otherwise noted.

to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i),[2] and 28 U.S.C. § 1581(c) (2012). For the reasons set forth below, the ITC's final affirmative injury determinations are sustained.

## I. Background

The statute governing unfair trade investigations requires a determination by the Commission on whether imported articles within the scope of a particular investigation (the "subject merchandise") have injured a domestic industry. See 19 U.S.C. §§ 1671, 1673. Domestic "industry" is defined as "the producers as a whole of the domestic like product…." 19 U.S.C. § 1677(4)(A). Three types of domestic injury are identified by statute: material injury, threat of material injury, or material retardation of the establishment of an industry. See 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1). There must be a causal nexus between a type of injury and imports of the subject merchandise, i.e., the injury must result "by reason of" imports of the subject merchandise. Id.

In order to make its determination, the Commission compares subject merchandise to its U.S. domestic counterpart, which by statute must be a product "which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10). The Commission relies on the "scope" of the subject merchandise provided by the U.S. Department of Commerce ("Commerce") to serve as the outside parameter for defining the domestic like product. See Views at 5 & n.13; see, e.g., NEC Corp. v. Dep't of Commerce, 22 CIT 1108, 1110

---

[2] Further citations to the Tariff Act of 1930, as amended, are to relevant provisions of Title 19 of the U.S. Code, 2012 edition.

(1998) ("[a]lthough the Commission must accept the determination of Commerce as to the scope of the imported merchandise sold at less than fair value, the Commission determines what domestic product is like the imported articles Commerce has identified").

If subject merchandise involves a range of products, as here, the Commission generally does not consider each iteration of merchandise to be a separate like product. Instead, the Commission considers the grouping of products to constitute a single domestic like product, and it will disregard minor variations among them absent a "clear dividing line" between particular products in the group. See Nippon Steel Corp. v. United States, 19 CIT 450, 455 (1995) (the ITC "disregards minor differences, and looks for clear dividing lines between like products"); see also Tapered Roller Bearings from China, Inv. No. 731-TA-344 (Fourth Review), USITC Pub. 4824 at 5–14 (Sept. 2018) (describing variety of sizes specifications, and applications for tapered roller bearings but defining a single domestic like product without clear dividing lines between products).[3]

In determining the domestic like product here, the Commission relied on Commerce's definition of the scope, namely, all CDMT of carbon and alloy steel of

---

[3] The following factors are considered in the Commission's like-product analysis: (1) physical appearance, (2) interchangeability, (3) channels of distribution, (4) customer perceptions, (5) common manufacturing facilities and production employees, and where appropriate, (6) price. See NEC Corp., 22 CIT at 1110. These factors are not exhaustive, as an investigation may give rise to other considerations relevant to the factual determination on the domestic like product, and the Commission's practice in defining domestic like product is on a case-by-case basis with no single factor considered dispositive. See, e.g., Views at 5.

circular cross-section, 304.8 mm or more in length, in actual outside diameters less than 331 mm, and regardless of wall thickness, surface finish, end finish, industry specification, production process (e.g., welded or seamless), further heat treatment or cold-finishing operations, or dual/multiple certification to standards. See Views at 5–6. Commerce's scope definition broadly covered CDMT steel products in which (1) iron predominates, by weight, over each of the other contained elements, and (2) the carbon content is two percent or less by weight. See id. at 6. In reaching its conclusion regarding injury, the Commission determined that there was a single domestic like product "that is coextensive with the scope of investigations." Id. at 15.

Autoliv imported "airbag tubing" for use in the manufacture of automotive safety airbag systems during the respective periods of the investigations ("POIs") of imported CDMT. In its comments to the Commission on the definition of the domestic like product, Autoliv did not dispute that the scope conceptually covered airbag tubing. Nevertheless, Autoliv contended that airbag tubing was a critical component of its production of airbag safety systems and that there was a "clear dividing line" in terms of production process, chemical and mechanical properties, and uses, between airbag tubing and CDMT generally. See, e.g., Views at 10–11, 13–15; Pl.'s Mot. at 4 (citing Prehearing Brief of Autoliv at 3, PD 165, CD 524). Autoliv further maintained that airbag tubing must be extremely hard, and at the same time ductile, in order to meet its critical safety purposes, and that there was no production currently of the domestic equivalent of airbag tubing nor did the domestic industry have plans to produce it. Id. Autoliv argued that the absence of domestic production did not preclude the Commission from

finding airbag tubing to be a separate domestic like product and that the Commission should have, in these circumstances, considered whether domestic production of airbag tubing was materially retarded under the third prong of the statute.

In response, the petitioners argued that Autoliv did not timely file comments requesting the Commission to collect separate data on U.S.-produced products like or most similar to airbag tubing. See Views at 10. Petitioners further contended that Autoliv's argument for a material retardation analysis was misplaced because Autoliv did not and could not allege the existence of material retardation, given that there is an established domestic industry producing CDMT that had previously produced airbag tubing and that retains the equipment to do so. See id. at 10, 14.

Ultimately the Commission agreed with the petitioners, explaining that the statute precluded it from considering airbag tubing as a separate domestic like product because there were no "like" domestic products or production of airbag tubing during the POIs. See id. at 14–15. The ITC observed that the domestic industry included U.S. producers who had previously manufactured airbag tubing and did not currently manufacture airbag tubing but retained the capacity to do so. Id. at 14. Accordingly, the Commission determined that imports of CDMT from China, Germany, India, Italy, Korea, and Switzerland caused material injury to a U.S. industry. See Final Determinations.

## II. Standard of Review

The court sustains the Commission's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting a reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2019). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2019).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837. 842–45 (1984), governs judicial review of the

Commission's interpretation of the Tariff Act. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (An agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

### III.  Discussion

Autoliv contends that, even though there was no U.S. production of airbag tubing during the POIs, the Commission's decision not to define airbag tubing as a separate domestic like product is unlawful. See Pl.'s Mot. at 3–14. Autoliv maintains that, given these circumstances, 19 U.S.C. §§ 1671d(b) and 1673d(b) require that the Commission conduct a material retardation analysis, which the Commission failed to do. Id. at 15–16. Autoliv also argues that it was unreasonable for the Commission to conclude that Autoliv did not identify a domestically produced variant that is most similar in characteristics and uses with airbag tubing. Lastly, Autoliv contends that the Commission has the burden to gather the requisite factual information and identify a suitable domestic like product for the purpose of determining whether airbag tubing constitutes a separate like product. Id. at 17–19.

### A.  Statutory Interpretation of "Domestic Like Product"

In considering the proper interpretation of "domestic like product" under 19 U.S.C. § 1677(10), the court applies the two-step framework of Chevron. Under step one of Chevron, the court considers whether Congressional intent on the issue is clear. See Chevron, 467 U.S. at 842–43 ("First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is

the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). If the court cannot identify a clear expression of Congressional intent and concludes that the statutory provision is silent or ambiguous as to the contested issue, the court turns to the second prong and determines whether Commerce's interpretation of the statute is reasonable. See id.

Autoliv argues that "[t]he Commission's interpretation of the industry and domestic like product definitions is inconsistent with the text of the statute and Congress's purpose and intent in enacting the antidumping and countervailing duty laws." Pl.'s Mot at 7. Specifically, Autoliv maintains that:

> The statute, 19 U.S.C. § 1677(10), defines the domestic like product with reference to 'a product… (importantly, not 'a domestic product' nor 'domestically manufactured product') which is like … or most similar… with the article subject to an investigation.' Thus, the statute unequivocally defines the domestic like product with reference to 'a product' identical or most similar to the imported subject merchandise, and not to domestically produced items.

Id. at 9. Autoliv thus contends that "the plain language in the statute … [requires] that the Commission must first determine the like product(s) subject to the investigations – here one of them is airbag tubing – and then the domestic 'like product' that is like or similar to airbag tubing and use that to define the U.S. industry to consider for Injury purposes." Id. at 10.

The Commission agrees with Plaintiff that the meaning of "domestic like product" is clear and unambiguous. However, it maintains that Autoliv's interpretation improperly relies on in-scope imports to define a non-existent "domestic" like product. See Views

at 13. The Commission argues that Autoliv's proposed definition of like product ignores

the "statute's mandate to identify a <u>domestic</u> item that is like or most similar to subject

imports." <u>Id.</u> (emphasis added). The Commission explains that the statute provides that

when material retardation is not an issue in an investigation and no like product is

produced domestically, the Commission is to identify a domestic product that is "most

similar in characteristics and uses" to subject merchandise:

> The ITC will examine an industry producing the product like
> the imported article being investigated, but if such an
> industry does not exist and the question of material
> retardation of establishment of such an industry is not an
> issue before the ITC, then the ITC will examine an industry
> producing a product most similar in characteristics and uses
> with the imported article.

Def.'s Resp. at 10 (quoting S. Rep. No. 96-249, at 90 (1979), <u>reprinted in</u> 1979

U.S.C.C.A.N. 381, 476).

        The precise question at issue here is whether the Commission may define a

separate "domestic like product" that is not produced domestically. "In order to

determine whether a statute clearly shows the intent of Congress in a <u>Chevron</u> step-one

analysis, [the court] employ[s] traditional tools of statutory construction and examine[s]

'the statute's text, structure, and legislative history, and appl[ies] the relevant canons of

interpretation.'" <u>Heino v. Shinseki</u>, 683 F.3d 1372, 1378 (Fed. Cir. 2012) (quoting

<u>Delverde, SrL v. United States</u>, 202 F.3d 1360, 1363 (Fed. Cir. 2000)).

        Plaintiff highlights that the statutory definition of "domestic like product" does not

refer to domestic production, thereby arguing that in circumstances where there is

no domestic production of a particular subject import, the statute contemplates that the

Commission "must first determine the like product(s) subject to the investigations … and then the domestic 'like product' that is like or similar to airbag tubing and use that to define the U.S. industry to consider for Injury purposes." See Pl.'s Mot at 9–10. The court disagrees. The text, structure, and legislative history of § 1677(10) convey a clear Congressional intent that the Commission define a "domestic like product" with respect to a product that is produced domestically.

Notably, the statute does not expressly require or provide for any precise methodology by which the Commission is to identify an appropriate domestic like product. See 19 U.S.C. §§ 1677(4) & 1677(10). Rather, the statute simply states that the Commission shall identify "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." See 19 U.S.C. § 1677(10) (emphasis added). As the Commission notes, the legislative history supports its interpretation that the term "domestic like product" was intended to cover only domestically produced merchandise. See Def.'s Resp. at 8 (noting that "when Congress in 1994 amended the term from 'like product' to 'domestic like product', the Senate report confirmed that 'like product' under U.S. law 'refers to U.S. production.'" (quoting S. Rep. 103-412, at 33, (1994))); id. at 10 ("The ITC will examine an industry producing the product like the imported article being investigated, but if such an industry does not exist and the question of material retardation of establishment of such an industry is not an issue before the ITC, then the ITC will examine an industry producing a product most similar in characteristics and uses with the imported article." (quoting S. Rep. No. 96-249, at 90 (1979))).

Plaintiff's argument that the term "domestic like product" in 19 U.S.C. § 1677(10) must be defined without reference to whether there is any domestic production of a proposed "like" product is misplaced. The Commission's interpretation of § 1677(10) comports with the statutory language's clear and unambiguous meaning. Autoliv's interpretation ignores the word "domestic" in the term "domestic like product" and runs contrary to Congressional intent. Accordingly, the court sustains the Commission's interpretation of the term "domestic like product" in the <u>Final Determinations</u>.

## B. Material Retardation

Beyond its argument that the Commission must define "domestic like product" by reference to subject imports (without regard to whether there is actually domestic production of identical or similar products), Autoliv argues that in circumstances where there is no domestic production of merchandise identical or similar to certain subject imports, the Commission is statutorily required to consider whether subject imports were materially retarding the establishment of a domestic industry for production of those goods. <u>See</u> Pl.'s Mot. at 14–16 ("once [the Commission] found no U.S. production of airbag tubing or a similar product, [it] was required by statute to consider if the establishment of an industry in the United States is materially retarded."). Autoliv maintains that the use of the mandatory term "shall" in 19 U.S.C. §§ 1671d(b) and 1673d(b) demonstrates that "[w]hen there is no production of a domestic like product, the statute requires the Commission to proceed to the question of material retardation of establishment of an industry." <u>Id.</u> at 15. Other than noting that §§ 1671d(b) and 1673d(b) direct that the Commission "shall make a final determination" as to material

injury to or material retardation of the establishment of a U.S. industry, Autoliv fails to explain how the statutory language of §§ 1671d(b) and 1673d(b) conveys a clear Congressional intent that answers the "precise question" of whether the Commission must proceed with a material retardation analysis in circumstances where there is no domestic production of an alleged separate like product. See Chevron 467 U.S. at 842–43.

Instead of presenting an argument under Chevron step one as it did with respect to 19 U.S.C. § 1677(10), Autoliv argues that certain commissioners, and even the Commission itself, have previously interpreted §§ 1671d(b) and 1673d(b) to provide for a material retardation analysis where there is no commercial domestic production of a particular product. See Pl.'s Mot. at 12–13, 15–16 (citing prior Commission decisions involving the use of a material retardation analysis given the absence of domestic production of a separate like product). As a result, Autoliv appears to suggest that the Commission's refusal to conduct a material retardation analysis in this matter is unreasonable and violative of §§ 1671d(b) and 1673d(b) under Chevron step two. As explained below, the court concludes that Autoliv's reliance on certain Commission precedent is misplaced and rejects Autoliv's preferred statutory interpretation.

Importantly, in the subject investigations, the Commission determined that the statute did not mandate it to conduct a material retardation analysis since there was an established domestic CDMT industry that had produced airbag tubing in the past and

which retained the productive capacity to produce airbag tubing.[4] See Views at 14.

The Commission reminded interested parties in its preliminary determinations that

"parties seeking a separate domestic like product for items not manufactured

domestically must identify a domestically produced variant most similar in

characteristics and uses to such items." Id. at 14–15. Given that Autoliv failed to identify

any such domestically produced variant, the Commission proceeded to define "a single

domestic like product that is coextensive with the scope of [Commerce's]

investigations." Id. at 15.

    The court agrees that the Commission reasonably interpreted the statute in

deciding not to conduct a material retardation analysis. As described above, Congress

plainly defined "domestic like product" in 19 U.S.C. § 1677(10) to encompass situations

where merchandise identical to the imported subject merchandise is not produced in the

U.S. domestically, i.e., "or in the absence of like, most similar in characteristics and

uses with, the article subject to an investigation under this subtitle." See supra Part III.A.

The Commission explained that its determinations in other investigations consistently

demonstrate that "the Commission would not define a separate domestic like product for

items not produced domestically and for which parties had not identified a domestic

variant that was most similar in characteristics and uses." Views at 14. The Commission

---

[4]  Autoliv responds regarding this point that "an industry that has not produced a product since 2012 would seem to be a nascent industry." Pl.'s Reply at 8. This response ignores the ITC's explanation as to why material retardation is not at issue in these investigations and why domestic airbag tubing production is not a "nascent industry" based on the information in the record. See Views at 14 ("Material retardation is not an issue in these investigations. Petitioners have confirmed that they have in the past manufactured airbag tubing and retain the capacity to do so.").

further clarified that the separate domestic like product inquiry is distinct from any obligation the Commission may have to consider material retardation of the establishment of a domestic industry. See id. at n.57 (quoting Professional Electric Cutting and Sanding/Grinding Tools from Japan, Inv. No. 731-TA-571, USITC Pub. 2536 (July 1992), at 6 ("A product not produced in the United States is not an appropriate candidate for a separate domestic like product determination, unless material retardation of the establishment of an industry in the United States is a genuine issue. It is not an issue in this investigation.")).

 The court has previously observed that "the lack of domestic production of identical merchandise is not a basis for recognizing a separate domestic like product." Hitachi Metals Ltd. v. United States, 42 CIT ___, ___, 350 F. Supp. 3d 1325, 1342 (2018), appeal docketed, No. 19-1289 (Fed. Cir. Dec. 11, 2018). Autoliv fails to present any arguments that lead the court to reach a different conclusion here. And contrary to Autoliv's proposed statutory interpretation, there is nothing inherent about the absence of domestic production of identical "like" merchandise that necessitates that the Commission commence a material retardation inquiry. See 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1); see also S. Rep. No. 96-249, at 90 (1979). Accordingly, the court sustains the Commission's decision in the Final Determinations not to consider whether there was material retardation of the establishment of a domestic industry.

## C.  Airbag Tubing as a Separate Domestic Like Product

 The Commission's analysis of the domestic like product entails finding the domestic product that corresponds to the subject imports, an inquiry that does not

involve a comparison of in-scope imports with one another, as Autoliv advocates. Autoliv argues nonetheless that the onus was on the Commission to make that determination, and that Autoliv should not have to bear the burden of placing evidence on the record of the domestically produced product that is "most similar in characteristics and uses with" subject imports of airbag tubing. Autoliv argues that in other investigations the Commission itself has undertaken to ensure that the record contained information about a suitable domestically produced variant of subject imports. See Pl.'s Mot. at 17–18 (referencing Ferrovanadium and Nitrided Vanadium from Russia, Inv. No. 731-TA-702 (Review), USITC Pub. 3420 at 5–6 (May 2001) ("Ferrovanadium") & Certain Frozen Fish Fillets from Vietnam, Inv. Nos. 731-TA-1095, -1096, and -1097 (Preliminary), USITC Pub. 3533 at 5 (Aug. 2002) ("Frozen Fish Fillets")).

Autoliv's reliance on these prior determinations is misplaced. In Ferrovanadium, the Commission indicated that it was accepting the domestic industry's assertion that domestically-produced ferrovanadium was the product most similar to subject imports of nitride vanadium. See Ferrovanadium at 5 (citing testimony from counsel to domestic industry at ITC hearing). In Frozen Fish Fillets, the Commission noted that the domestic industry had identified frozen catfish fillets as the domestically produced item most similar to subject imports. See Frozen Fish Fillets at 5 (highlighting that "[p]etitioners argue that the product 'most similar in characteristics and uses' to subject imports is frozen catfish fillets"). Read in context, both of these ITC determinations demonstrate that the Commission solicits and relies on information provided by interested parties in

order to determine domestically produced articles that were "most similar in characteristics and uses" to subject imports. These determinations do not support Plaintiff's contention that the Commission maintains an independent responsibility to identify domestically-produced items to serve as the domestic like product in circumstances where there is no domestic production of certain subject imports.

As the Commission noted, 19 C.F.R. § 207.20(b) requires any and all "requests for collecting new information" to be made by "parties to the investigation" in their respective comments on the Commission's draft questionnaires. See Def.'s Resp. at 13. The Commission states that it "further reminded" parties of this obligation in its preliminary views, requesting that the "parties" identify with "specificity" any product for which they sought a separate domestic like product in comments on draft questionnaires, and that in the final analysis Autoliv did not avail itself of that opportunity. Views at 14–15 (referencing Cold-Drawn Mechanical Tubing from China Germany, India, Italy, Korea, and Switzerland, Inv. Nos. 701-TA-576-577 and 731-TA-1362-1367 (Preliminary), USITC Pub. 4700 at 10 n.22[5] (June 2017), PD 86 ("Preliminary Views")). Autoliv responds that § 207.20(b) begins by stating: "The Director shall circulate draft questionnaires for the final phase of an investigation … for comment," and Autoliv complains that it "was not provided drafts even though its views were reflected in the Staff Report in the preliminary investigation." Pl.'s Reply at 10 (referencing Preliminary Views at II-12 & n.34). Autoliv also contends that the

---

[5] The court notes that the pincite in the Views is slightly inaccurate, and that the relevant reminder language that ITC references may be found in the text of the conclusion on page 13 of the Preliminary Views, as well as in footnote 22 on pages 8–9.

Commission's procedural argument implies that the Commission lacks data with respect to airbag tubing, but Autoliv maintains that "[t]he record is complete as to airbag tubing on both the import and domestic sides." Id.

Autoliv, however, leaves unchallenged the Commission's finding that airbag tubing was not produced domestically during the respective POIs, and Autoliv has failed to establish that the Commission acted unreasonably in refusing to define airbag tubing as a separate domestic like product. See Hitachi Metals, 350 F. Supp. 3d at 1342. The Commission does bear responsibility for making the ultimate legal determinations, but it cannot do so in a vacuum, without the assistance of interested parties. The Commission explained that it requires parties seeking a separate domestic like product determination for imported items not made domestically to identify a domestically-produced item most similar in characteristics and uses to the imported item. See, e.g., Views at 13 & n.52. Given the absence of domestic production of airbag tubing, Autoliv should have heeded the Commission's suggestion (made in addressing another party's similar argument) to propose the domestic product that is "most similar in characteristics and uses" to the subject merchandise that is imported airbag tubing and request the Commission to undertake data collection for it. See Preliminary Views at 8–9 n.22 ("Hubei Steel failed to identify any domestically manufactured product 'most similar in characteristics and uses with' imported cold-drawn alloy seamless tubing …. Even if there is no domestic production of the product, because Hubei Steel has not identified a domestically produced variant that is 'most similar in characteristics and uses with' this product, we determine not to define it as a separate domestic like product."). Autoliv is

the party best positioned to understand and clarify the parameters of such a request, not the Commission.

Autoliv argues that it did not propose any comparable product beyond airbag tubing itself because "There is no U.S. Product Similar to Airbag Tubing." <u>See</u> Pl.'s Reply at 4–5. However, contradictorily, Autoliv also argues that it suggested to the Commission that the product most "like" airbag tubing is "other types of CDMT." <u>See</u> Pl.'s Mot. at 19; Pl.'s Reply at 5. Given that the Commission defined a "single domestic like product that is coextensive with the scope of the investigations," (<u>i.e.</u>, CDMT), the court cannot agree with Plaintiff's contention that the ITC's domestic like product determination was unreasonable.

### III. Conclusion

Based on the foregoing, the court sustains the <u>Final Determinations</u>. Judgment will enter accordingly.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: December 6, 2019
       New York, New York